UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNDA EDWARDS, *et al.*,<br>*Plaintiffs*,<br>v.<br>CYBEX INTERNATIONAL, INC.,<br>*Defendant*. | No. 22-CV-2985 (KMK)<br>OPINION & ORDER |

Appearances:

Allison B. Lane, Esq.
Lane & Ducheine
Plantation, FL
*Counsel for Plaintiffs*

Michael S. Mosscrop, Esq.
Franklin, Gringer, Cohen & Mosscrop, P.C.
Garden City, NY
*Counsel for Plaintiffs*

Michelle Gilboe, Esq.
Lewis Brisbois
Minneapolis, MN
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Lynda Edwards ("Edwards") and her husband Richard Edwards (together, "Plaintiffs") bring this Action against Cybex International, Inc. ("Defendant"), alleging defects in the design and warning labels of Defendant's 45-degree inclined leg press machine (the "machine") caused Edwards's injuries and caused her husband to suffer loss of consortium. Before the Court is Defendant's Motion for Summary Judgment and both Parties' motions to exclude one another's expert testimony (the "Motions"). Because the opinions of Plaintiffs' primary expert must be

excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, Plaintiffs cannot prove key elements of their products liability claim, so the Court grants summary judgment to Defendant.

## I. Background

### A. Factual Background

The following facts are drawn from the Rule 56.1 statement and counterstatement, and are not genuinely disputed unless indicated otherwise.

Defendant manufactures exercise equipment, including the machine at issue here. The machine allows users to load weight onto a movable carriage, which has a plate in the middle of it that a user, seated at the bottom of the machine, pushes up at a 45-degree angle. (Def.'s Rule 56.1 Stmt. of Undisputed Material Facts ("Def.'s 56.1") ¶ 2 (Dkt. No. 127).) When the machine is not in use, the weight plate sits on a carriage support. (*Id.* ¶ 3.) To start a set, the user pushes up the plate with their feet, then pulls on handles next to the seat to release the carriage support. (*Id.*) Once done with a set, the user engages the handles again to put the carriage support back in its place, then lets the plate down with their feet to rest it on the support. (*Id.*) The machine works essentially the same as other manufacturers' 45-degree inclined leg presses and is a common design. (*See id.* ¶ 5; Aff. of Michelle R. Gilboe in Supp. re: Mot. for Summ. J. & Mots. to Exclude Pls.' Experts ("Gilboe Aff.") Ex. G ("Abraham Dep."), at 18:20–19:6 (Dkt. No. 126).) The machine has four warning stickers on it. (Def.'s 56.1 ¶¶ 6–7.) The warning facing the user begins with "WARNING," notes "[s]erious injury could result if carriage falls towards user," and tells the user to "[e]ngage carriage support at end of exercise using rear lock handles to avoid injury." (*Id.* ¶ 7.) Plaintiffs' expert disputes whether the warning is easily readable, although Edwards did not testify herself on the warning's readability. (Pls.' Resp. to Def.'s Rule

56.1 Stmt of Material Facts ("Pls.' Counter-56.1") ¶ 6 (Dkt. No. 132); *see generally* Gilboe Aff. Ex. I ("Edwards Dep.").)

Edwards used the machine while exercising at a gym on February 4, 2019. (Def.'s 56.1 ¶ 1.) At the end of her set, she manipulated the handles and put the carriage back. (*Id.*; Pls.' Counter-56.1 ¶ 1.) She remained in the seat of the machine to stretch for a little more than a minute, and while she was sitting and stretching, the carriage fell and struck her head, causing her injuries. (Def.'s 56.1 ¶ 1.)

The Parties dispute how and why this happened. Plaintiffs contend the machine was in a deceptive, partially-engaged state: Edwards manipulated the handles and received some sort of feedback indicating to her that the carriage was fully secured when it was not. (*See generally* Edwards Dep. 201:15–02:25 (Edwards's testimony that she "could feel it" "locking . . . physically" when she pushed up the plate and pulled the locking mechanism); *id.* at 203:15–19 (Edwards's testimony that she "would feel it more in [her] feet" and would then "know it's locked").) Plaintiffs also argue the warnings on the machine were insufficient to alert a user to the hazard of the plate falling if the handles are not fully engaged. (*See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. & Mots. to Exclude Pls.' Experts ("Pls.' Mem.") 42–43 (Dkt. No. 130).) Defendant says Edwards's "partial engagement" theory is simple misuse: Edwards would have or should have known the handles were not fully engaged, and it is impossible for the plate to drop when the handles are fully engaged. (*See* Gilboe Aff. Ex. O ("McLean Dep."), at 79:24–80:1 ("[T]his incident has been a result of misuse of the machine and not any fault of the machine itself.").) And Defendant contends Edwards properly understood the contents of the existing warnings, which Defendant argues were sufficient, and that she knew how to properly

use the machine. (*See* Mem. in Supp. re: Mot. for Summ. J. & Mots. to Exclude Pls.' Experts ("Def.'s Mem.") 34 (Dkt. No. 125).)

B. Procedural History

Plaintiffs initiated this Action in New York Supreme Court, Westchester County, on February 4, 2022. (*See* Notice of Removal 1 (Dkt. No. 1).) Defendant removed to this Court on April 11, 2022, one month after it was served. (*See id.*) Plaintiffs amended the Complaint on May 5, 2022. (*See* Am. Compl. (Dkt. No. 22).) Defendant answered on May 25, 2022. (*See* Answer (Dkt. No. 26).) Following discovery, Plaintiffs stipulated to the dismissal of manufacturing defect claims and Consumer Product Safety Act claims from the Amended Complaint. (*See* Stipulated Dismissal (Dkt. No. 86).) After further discovery extensions, the Court set a briefing schedule for the motion for summary judgment and motions to exclude experts. (*See* Mot. Scheduling Order (Dkt. No. 121).) Defendant filed its motions on December 5, 2025. (*See* Mot. for Summ. J. & Mots. to Exclude Pls.' Experts (Dkt. No. 124); Def.'s Mem.) Plaintiffs opposed Defendant's motions and filed their own motion to exclude Defendant's experts on January 12, 2026. (*See* Pls.' Mem.) Defendant replied in support of its motions on February 12, 2026, (*see* Reply Mem. in Supp. re: Mot. for Summ. J. & Mots. to Exclude ("Def.'s Reply") (Dkt. No. 135)), and Plaintiffs replied in support of their motions on February 26, 2026, (*see* Reply Mem. in Opp'n re: Mot. for Summ. J. & Mots. to Exclude ("Pls.' Reply") (Dkt. No. 137)). The Court heard argument on the pending motions on July 23, 2026. (*See* Dkt. (minute entry dated July 23, 2026).)

## II. Discussion

### A. Standard of Review

#### 1. Motion to Exclude Expert Testimony

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence." *Bah v. Nordson Corp.*, No. 00-CV-9060, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). "This is true even if the exclusion of expert testimony would be outcome-determinative." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005). "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

Rule 702 provides that a

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration adopted) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]"

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted); *see also In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (same).

Although it is the jury's role to determine the credibility of an expert witness, it is the trial court's role to serve as a "gatekeep[er]" to ensure that the expert testimony is reliable and relevant before it is presented to the jury. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). Factors to consider for the reliability of an expert's methods include whether the expert's theory or technique can be tested, whether the theory or technique has been subject to peer review, the error rate of the methodology, and whether the methodology has been generally accepted by the academic or scientific community. *See Daubert*, 509 U.S. at 593–95; *see also Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 226–27 (2d Cir. 2021) (explaining the "four factors set forth in *Daubert*").

2. Motion for Summary Judgment

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk Cnty.*, 17 F.4th 352, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (substantially same). "It is the movant's burden to show that no genuine factual

dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted, citation and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [the non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'" *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter");

*Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where, however, the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Simpri v. City of N.Y.*, No. 00-CV-6712, 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003)); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "where each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court"). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact"); *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *6 (S.D.N.Y. Sept. 9, 2024) (same).

B. Analysis

Plaintiffs assert three causes of action in their Amended Complaint, as trimmed by the voluntary dismissals discussed above: (1) a design defect claim, alleging Defendant designed an unreasonably unsafe product; (2) a warning defect claim, alleging Defendant did not properly warn users of the risks of the product; and (3) a loss of consortium claim on behalf of Edwards's husband, which is derivative of the other two claims. (*See generally* Pls.' Mem.) Defendant moves to exclude Plaintiffs' experts and moves for summary judgment on all three claims. (*See*

*generally* Def.'s Mem.) Plaintiffs oppose Defendant's Motions and cross-move to exclude Defendant's experts. (*See generally* Pls.' Mem.)

In New York, "to establish a prima facie case in strict products liability [or negligence] for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing [the] plaintiff's injury." *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983). A "claim for design defect" under New York law has "three elements." *Kane v. Covidien LP*, No. 23-CV-9207, 2025 WL 486658, at *6 (E.D.N.Y. Feb. 12, 2025). "[T]he plaintiff must demonstrate that (1) the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing [the] plaintiff's injury." *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 507 (E.D.N.Y. 2019) (quotation marks omitted). For the second element, Plaintiffs must prove the product could be designed safer: they cannot argue the product should be banned outright. *See Adamo v. Brown & Williamson Tobacco Corp.*, 900 N.E.2d 966, 969 (N.Y. 2008) ("To hold, as plaintiffs ask, that every sale of regular cigarettes exposes the manufacturer to tort liability would amount to a judicial ban on the product. If regular cigarettes are to be banned, that should be done by legislative bodies, not by courts."); *S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12 (2d Cir. 2014) (summary order) ("[A] design-defect claim will not stand if the only alternative is an outright ban.").

A product may also be defective where "the manufacturer failed to provide adequate warnings regarding the use of the product." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 253 (E.D.N.Y. 2014) (quoting *Voss*, 450 N.E.2d at 207). To prevail on a claim for

negligent failure to warn, a plaintiff must demonstrate that a manufacturer has a duty to warn against dangers resulting from foreseeable uses about which it knew or should have known, and that failure to do so was the proximate cause of the harm. *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 305 (N.Y. 1998); *see also Tears v. Boston Sci. Corp.*, 344 F. Supp. 3d 500, 511 (S.D.N.Y. 2018) (same) (quoting *State Farm Fire & Gas Cas. Co. v. Nutone, Inc.*, 426 F. App'x 8, 10 (2d Cir. 2011) (summary order)).

The Court begins with Defendant's Motion to Exclude Dr. Abraham, then proceeds to Defendant's Motion for Summary Judgment, because Plaintiffs cannot establish key elements of their claims without Dr. Abraham's testimony.

1. Motion to Exclude Dr. Abraham

a. Expert's Qualifications

The Court begins with whether Dr. Abraham is qualified to offer testimony in this case and concludes that he is. "To make th[e] determination" whether an expert is qualified, "a court must ascertain whether the proffered expert has the educational background or training in a relevant field." *Averbach v. Cairo Amman Bank*, 802 F. Supp. 3d 605, 628 (S.D.N.Y. 2025) (quotation marks omitted); *see also Tardif v. City of New York*, 344 F. Supp. 3d 579, 595–96 (S.D.N.Y. 2018) (same).

Most relevant to this case, Dr. Abraham ran an organization "employ[ing] over 100 PhD[s] with full laboratory facilities" that conducted "evaluation and reconstruction of hundreds of incidents involving fitness products and injuries," taught seminars at a local university for 13 years on "the design, manufacture, and use of fitness and exercise products," and is a licensed engineer and member of organizations including the National Academy of Forensic Engineers and the American Board of Forensic Examiners. (Gilboe Aff. Ex. B ("Abraham Rep."), at ¶¶ 1–

5.) Abraham's background and training in the use and production of other exercise equipment, with his engineering experience as helpful context, make him qualified to testify as to the subject matter of this case—an alleged design defect in exercise equipment and how that equipment functions. *See, e.g.*, *Woelfle v. Black & Decker (U.S.) Inc.*, No. 18-CV-486, 2023 WL 4407577, at *5 (W.D.N.Y. July 7, 2023) (finding expert qualified in products liability case where expert had "prior experience in the field of engineering generally and with [similar products to the one at issue] more specifically . . ."); *Peretz v. Home Depot Inc.*, No. 08-CV-4106, 2009 WL 3124760, at *3 (E.D.N.Y. Sept. 29, 2009) (finding expert qualified in design defect case, "albeit barely," where "product at issue has sufficient similarities to those with which the expert has worked and had experience developing so that the expert's experience is relevant").

Accordingly, Dr. Abraham satisfies the first requirement of Rule 702.

b. Sufficient Facts or Data

As for the second requirement of Rule 702, the Court finds Dr. Abraham's report is not based on sufficient facts or data. Dr. Abraham claims his report is based on his "review of documents and discovery exchanged by the parties," his "professional training, work experience, professional duties," and "prior consultation in similar cases." (Abraham Rep. ¶ 10.) But at his deposition, Dr. Abraham testified that he did not review critical documents and discovery before offering his opinions. For example, he had not reviewed Edwards's deposition before producing either his initial report or his rebuttal report. (Abraham Dep. 12:18–25.) Nor had he inspected the machine, which was made available in discovery, until long after his report and deposition, (*see* Letter Mot. to Strike 1 (Dkt. No. 122)), and his rebuttal report includes no findings from his subsequent review of the discovery, if he conducted any such review, (*see* Gilboe Aff. Ex. C ("Abraham Rebuttal Rep.")). That alone is fatal. *See In re Rezulin Prods. Liab. Litig.*, 309 F.

Supp. 2d 531, 550 (S.D.N.Y. 2004) ("Because Dr. Tolman wrote his report before having the supporting data, his opinions are not 'based upon sufficient facts or data' and do not proceed from 'reliable principles and methods,' as required by Rule 702."). Moreover, Dr. Abraham did not consult any literature, peer reviewed or otherwise; he only searched for such information while assessing the comparable safety of some similar machines (but did not find anything). (*See generally* Abraham Rep.; *see* Abraham Dep. 185:15.) There is more. Dr. Abraham explained that his two alternate design theories—a stop bar and a horizontal leg press—are based on, respectively, something he came up with "in [his] head," (Abraham Dep. 175:10), and a machine he used on occasion himself in physical therapy, (Abraham Rep. ¶ 18).

Plaintiffs thus have not proven a sufficient basis in facts or data for Dr. Abraham's opinions. *See Rodriguez v. Athenium House Corp.*, No. 11-CV-5534, 2013 WL 796321, at *3 (S.D.N.Y. Mar. 5, 2013) ("Expert opinions may also be excluded 'when based on conjecture rather than evidence in the record.'" (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007)); *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 475–77 (S.D.N.Y. 2004) (rejecting expert opinion where expert based his opinion solely on his own authority and did not perform his own inspection or evaluation); *Zaremba v. Gen. Motors Corp.*, No. 98-CV-2505, 2003 WL 22331287, at *3 (E.D.N.Y. Apr. 25, 2003) (excluding the experts' testimony because they had not "produced scientifically sound, useful, empirical data to support their opinions").

c. Reliable Principles or Methods

Plaintiffs have also not shown Dr. Abraham's testimony is the product of reliable principles and methods. In general, Dr. Abraham's report and deposition do not explain what testable, peer-reviewed, low-error, or "general[ly] accept[ed]" methods with scientific

foundations he uses. *Daubert*, 509 U.S. at 592–94. Nothing in the report explains how the "partially latched" state works or how Edwards could have felt the handles engage even when they did not—*i.e.*, specifically how the machine is defective, the core of Plaintiff's case. (*See generally* Abraham Rep.; *id.* ¶ 23 (only stating that there "was no guarantee that a lay person would know if the locking was complete or not").)

Plaintiffs ascribe a few methodologies to Dr. Abraham, all of which either he did not, in fact, apply, or which the Court rejects under *Daubert*. Plaintiffs point first to his deposition testimony that "basic engineering, safety engineering principles" undergird his report. (Pls.' Mem. 8 (citing Abraham Dep. 177:8–9).) So generic a "method" will not do without further explanation. *See Speedfit LLC v. Woodway USA, Inc.*, No. 13-CV-1276, 2019 WL 1436306, at *8 (E.D.N.Y. Mar. 29, 2019) ("Moreover, the bases informing [the expert's] judgment must be sufficiently articulated such that the court can determine, as it is required to, whether the expert reasonably applied the methodology to the facts of the case."); *Kuzmech v. Werner Ladder Co.*, No. 10-CV-266, 2012 WL 6093898, at *7 (D. Conn. Dec. 7, 2012) (excluding testimony of engineering expert in products liability case where expert did not identify "what principles and methods he relies upon in coming to his conclusions besides his conclusory statement that such conclusions were based on a 'reasonable degree of engineering certainty'").

Plaintiffs next argue that Dr. Abraham's method is the "hierarchy of controls," purportedly, a three-step process by which (1) risks must be designed out, (2) guarded against, or (3) warned of, in that order. (Pls.' Mem. 9.) But neither that phrase nor that process appears in the portions of Dr. Abraham's report and deposition that Plaintiffs cite, nor anywhere else in the record. (*See* Abraham Rep. ¶¶ 24–26 (not mentioning the hierarchy of controls); Abraham Dep. 146:9–147:3 (same).) Dr. Abraham does not explain where the process come from, or why it

would follow from that process that, as he contends, every product must be risk-free, (*see* Abraham Dep. 146:12–14 ("Q: [I]t's your opinion that Cybex knew their model had to be fail-safe, right? A: Yes."), which is inconsistent with New York law, *see Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001) (explaining that under New York law, the "ultimate issue is whether the product is reasonably safe, not whether it incorporated the safest possible features").[1]

Dr. Abraham, at some points in his deposition, shed more light on his methods. He testified that he "look[ed] at what happened in the accident and how it could happen" and whether "that particular incident" could have been prevented; whether "alternative safer methods of creating an apparatus that would be completely safe and void of any risks" existed; and did "research" on whether such an apparatus was "available in the stream of commerce" doing "similar exercises" but "eliminat[ing] that risk." (Abraham Dep. 204:7–205:23.) Another part of his methodology for assessing safe alternative designs is "do[ing] a lot in [his] head" to think of an alternative, and "then what [he] do[es] is that [he] make[s] prototypes" of those safe alternative designs to evaluate them. (*Id.* 175:6–11.) The Court assumes without deciding that

[1] Nor does the phrase "hierarchy of controls" appear in any similar New York products liability case. In the few federal cases discussing it, it typically relates to mitigating *workplace* hazards, and does not consist of the steps Plaintiffs say. *See, e.g.*, *Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1265 (11th Cir. 1999) (explaining how a "restriction on the use of respirators, sometimes referred to as the Hierarchy-of-Controls Policy, . . . became an ingrained part of OSHA's regulatory framework, and was codified at 29 C.F.R. § 1910.134(a)(1)"). Indeed, it bears noting that in the actual hierarchy of controls, there are five levels, not three. *See Chavez v. San Francisco Bay Area Rapid Trans. Dist.*, No. 22-CV-6119, 2024 WL 3092153, at *1 (N.D. Cal. June 21, 2024) ("The hierarchy of controls has five levels of actions to reduce or remove hazards. . . . (1) Elimination (2) Substitution (3) Engineering controls (4) Administrative controls (5) Personal protective equipment (PPE).").

these are both sound methodologies for someone of Dr. Abraham's experience and engineering background in a design defect case, and considers the next requirement of Rule 702.[2]

d. Application to the Facts of the Case

The Court finds Dr. Abraham did not reliably apply any of what he described as his methods to the facts of this case. First, although Dr. Abraham said it was part of his method to do so, he testified that he did not review Edwards's deposition prior to his report or his own deposition, and although he said part of his method involved "research" on alternate designs for the machine in the "stream of commerce," that began and ended with a machine he used himself on occasion at his physical therapist's office. (*See* Abraham Dep. 12:18–25 (Abraham testifying he had not read Edwards's deposition transcript "at all" before producing either of his reports); Abraham Rep. ¶¶ 18–20 (asserting that the horizontal leg press, which Abraham "use[s] . . . every week," is a preferable alternative only because it is "risk free").) An expert must be excluded where, as is the case here, he "fail[s] to apply his own methodology reliably." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002).[3]

---

[2] Dr. Abraham's deposition and report also occasionally mention "risk analysis." (*See, e.g.*, Abraham Rep. ¶¶ 23, 24.) He does not explain what that means or entails, however, and Plaintiff's counsel could not shed any more light on it at argument. (*See* Hr'g Tr. 20:18–22:19, 29:3–14 (on file with Court).) There is accordingly not enough on the record to consider "risk analysis" a reliable method.

[3] Even if the Court agreed that Dr. Abraham's conclusions about the horizontal leg press were the result of reliable principles reliably applied to the facts of the case, those opinions are irrelevant here because the horizontal leg press is a different product than the machine here. As noted, a New York law design defect claim requires showing a product could be designed more safely, not that the courts should ban it outright. *See Adamo*, 900 N.E.2d at 969. Accordingly, a "plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used." *Hilaire*, 54 F. Supp. 3d at 248.

The machine and the horizontal press are entirely different products. Dr. Abraham's report itself explains how the horizontal press's mechanism is entirely different—it is cable-based, the user's body is positioned differently, the weights are selected and loaded differently,

Second, Dr. Abraham's methods for deriving and evaluating new, safe alternative designs were also not reliably applied to the facts of this case. Dr. Abraham proposed a permanent stop bar as another safe alternative design, which is mentioned once in passing in his report and is not diagrammed, tested, or otherwise explained. (*See* Abraham Rep. ¶ 24.) At his deposition, he explained that he had not considered the possible effects of the stop bar on the machine's utility because—though he said this was part of his method—he did not make or test a prototype because he, simply, "in [his] head know[s] that if [the machine] had something like that there," the injury would not have occurred, and that it was "not [his] job" to consider its possible implementation. (Abraham Dep. 173:15–20, 176:10–15.) "Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests," and the Court does the same here. *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004); *see also Erazo v. SCM Grp. N. Am.*, No. 16-CV-2386, 2019 WL 1044365, at *12 (E.D.N.Y. Mar. 5, 2019) (same).

---

and the user pushes themselves rather than a plate. (*Compare* Abraham Rep. ¶ 19, *with id.* ¶ 11.) Asked about this at his deposition, Dr. Abraham stated that—*based on his observation of gymgoers at his hotel the night before*—"[n]obody . . . was interested in any part of their body except their legs," so because users could exercise their legs on either machine, the machines were the same product. (Abraham Dep. 165:14–22.) But two products are not *per se* not "entirely different" where their end functions are similar. *See, e.g.*, *Hilaire*, 54 F. Supp. 3d at 248 (explaining a trap saw and table saw were "entirely different device[s]," though it is obvious both can cut things, and rejecting design defect theory proposing one as a safe alternative for the other); *Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, No. 17-CV-6980, 2025 WL 1907206, at *17 (E.D.N.Y. July 10, 2025) (explaining even though a proposed alternative to a chemical product "could have been used" for the same purpose as the product at issue, it was a different chemical, so the alternative design theory failed). That "the exercise utility is identical," (Pls.' Mem. 41), does not make them the same product—otherwise, a barbell on a squat rack would be the same product as the machine here.

Third, the opinions offered as to the sufficiency of the warnings on the machine are also not the result of the reliable application of reliable principles. Plaintiff's proposed warning is as follows, reproduced from the expert report:

**DANGER!**
**AFTER COMPLETING THE LEG LIFTS MAKE SURE YOU MANUALLY LOCK THE LOADED PLATE BEFORE GETTING UP AND OFF THE CYBEX LEG LIFT**

**FAILURE TO LOCK THE LOADED PLATE MAY RESULT IN A PERMANENT BODILY, PERMANENTLY HEAD AND BRAIN INJURY OR DEATH**

(Abraham Rep. ¶ 26 (second paragraph numbered 26).) Dr. Abraham explains that he "did that [warning] off the top of [his] head," (Abraham Dep. 163:9–10), and while he claimed Defendant's warnings "don't follow the protocols set forth by the ASTM, ANSE, and ISO," he did not explain why his warning did, except that it is "a lot more honest," (*id.* at 158:24–159:6). Moreover, Dr. Abraham acknowledges the only difference of note between this warning and the warning on the machine is that his "signal word" is "danger," not "warning." (*Id.* at 164:10–14.) The difference between these signal words, as the Parties agree, is that "warning" refers to risks that *could* materialize, and "danger" refers to risks that *will* materialize. (*See* Def.'s Mem. 24.) But Plaintiffs' counsel was clear at argument that the hazards or injuries associated with the machine were ones that *could* occur, not ones that *will*—for example, had Edwards gotten off of the machine less than one minute and twenty-two seconds after finishing her set, her injury would not have occurred—so it is unclear how their expert arrived at a contrary conclusion.[4] (*See* Hr'g Tr. 39:24–40:13.)

---

[4] Even if the Court agreed this alternative warning was the result of reliable principles reliably applied, it would not advance Plaintiff's case any further. Courts have rejected precisely this "signal word" argument where, as here, the plaintiff had reason to know from repeated prior use of a product what its dangers were—not to mention that here, Edwards testified that she had in fact read the warning, (*see* Edwards Dep. 55:2–56:12, 106:10–19), so it is unclear what difference a new signal word would make. *See Khusenov v. Prokraft Inc.*, No. 21-CV-3703,

Accordingly, because this testimony was not based on sufficient facts or data and because it was not the product of reliable methods reliably applied to the facts of this case, the Court grants Defendant's motion to exclude Dr. Abraham's testimony.

2. Motion for Summary Judgment

Plaintiffs' remaining claims are strict liability and negligence theories of design and warning defects, and a derivative loss of consortium claim. (Pls.' Mem. 37–45.) Strict liability and negligence theories of products liability under New York law are the functionally the same, and Plaintiffs and Defendant do not put forth different explanations for either theory here. *See Tears*, 344 F. Supp. 3d at 509 ("Under New York law, which applies in this diversity action, negligence claims under these three theories are 'functionally equivalent' to their strict liability counterparts.").

a. Design Defect

As explained above, a design defect claim under New York law has three elements: "(1) that the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing [the] plaintiff's injury." *Zsa Zsa Jewels*, 419 F. Supp. 3d at 507. Without their now-excluded expert testimony, Plaintiffs cannot create a genuine dispute of material fact as to the second element—a feasible safer design for the product. Plaintiffs rely

---

2023 WL 1785527, at *12 (E.D.N.Y. Feb. 6, 2023) ("The Meat Grinder's warning label is not inadequate simply because [the p]laintiff's expert opines that the word 'Warning' on the warning label should instead read 'Danger.'"), *aff'd*, No. 23-320, 2024 WL 959620 (2d Cir. Mar. 6, 2024); *Hilaire*, 54 F. Supp. 3d at 250–51 (rejecting argument that label was defective because it said "warning" and not "danger" where, "in light of plaintiff's own testimony, there appears to be no question that any change in the warning would not have prevented this accident").

entirely on the now-excluded testimony to dispute the feasibility of an alternative design and do not set forth any way a jury, without this testimony, could find in their favor on this element. (*See, e.g.*, Pls.' Counter-56.1 ¶¶ 4–5; Pls.' Mem. 41–42.)

Courts routinely grant summary judgment on design defect claims after excluding expert testimony on safe alternative designs because typically, "[i]n order to prove liability grounded upon a design defect, New York law requires plaintiffs to proffer expert testimony as to the feasibility and efficacy of alternative designs." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 740 (E.D.N.Y. 2016); *see also Nemes v. Dick's Sporting Goods, Inc.*, 521 F. Supp. 3d 328, 339 (S.D.N.Y. 2021) (collecting cases where courts have "granted summary judgment based on the lack of expert evidence" on alternative designs for a product where a physical safety barrier is proposed on the product, as here); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 188 (E.D.N.Y. 2009) (granting summary judgment on the plaintiff's strict liability and negligence products liability claims where plaintiff's expert was precluded from testifying, and the plaintiff therefore could not "demonstrate evidence of a defect in the design of the product at issue").[5] So too here—because Plaintiffs offer no admissible expert evidence as to a safe alternative design, nor any explanation of what lay evidence on this issue a jury could consider, the Court must grant summary judgment to Defendant on Plaintiffs' design defect claim.

---

[5] Courts will, however, allow lay testimony to establish a safe feasible alternative design where that "reasonable alternative design is both obvious to, and understandable by, a layperson." *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 437 (E.D.N.Y. 2013) (quotation marks omitted), *aff'd*, 559 F. App'x 11 (2d Cir. 2014) (summary order). This is not such a case; of plaintiff's two alternative designs, one is a different product entirely, *see supra* note 2, and the other, the permanent stop bar, cannot be presented through lay testimony because it is far from clear that "a lay [witness] would readily understand, much less find obvious, the nature of" exercise machine design and the feasibility, costs, or effects of such a modification, *Nemes*, 521 F. Supp. 3d at 339.

b. Warning Defect

A warning defect claim requires a plaintiff to show that (1) a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so proximately caused the plaintiff's injury. *See Liriano*, 700 N.E.2d at 305–06. As with Plaintiffs' design defect claim, because there is nothing on the record other than Dr. Abraham's testimony that would suggest the warning was defective, the exclusion of that testimony requires the Court to grant summary judgment on Plaintiffs' warning defect claim.

In their Rule 56.1 Counterstatement, Plaintiffs point only to Dr. Abraham's testimony to create fact issues as to the sufficiency of the warning. (*See* Pls.' Counter-56.1 ¶¶ 5–7.) And in their briefing on the warning issues, while Plaintiffs mention Edwards' deposition, (*see* Pls.' Mem. 42–43), her deposition is not enough to sustain her warning defect claim because she "failed to describe what additional warning was required and has failed to show that such a warning would have prevented [her] injury," *Leon v. United Indus. Corp.*, No. 21-CV-5174, 2024 WL 3638008, at *5 (S.D.N.Y. Aug. 2, 2024). The only additional warning Plaintiffs have offered is Dr. Abraham's, which, even if the Court admitted, Plaintiffs have not shown would have prevented Edwards' injury. *See supra* note 4. Accordingly, the Court must also grant summary judgment to Defendant on Plaintiffs' warning defect claim. *See Wilson-Wolf v. Tesla Vehicles*, No. 22-CV-10066, 2026 WL 84499, at *5 (S.D.N.Y. Jan. 12, 2026) (granting summary judgment on failure to warn claim where plaintiff did not "identif[y] a specific warning deficiency nor provide[] any evidence that an additional or different warning would have . . . prevented the accident"); *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 254 (D. Conn. 2017) (granting summary judgment to defendants in products liability case after excluding the

plaintiff's expert, because without "a credible expert, [the p]laintiff [could ] not establish that [the defendant's] warnings were defective").

c. Loss of Consortium

Plaintiffs also bring a claim for loss of consortium as a result of the injuries Edwards sustained from her use of the machine. (*See* Pls.' Mem. 45.) This claim is derivative of the other products liability claims—Defendant only moves for summary judgment on this claim to the extent summary judgment is granted on the others. (Def.'s Mem. 51.) *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) ("[S]ince none of Mr. Griffin's [products liability] claims survive, Mrs. Griffin's derivative claims alleging loss of consortium must also be dismissed."). Accordingly, because the Court grants summary judgment on the design and warning defect claims, the Court grants summary judgment on the loss of consortium claim as well.

3. Remaining Motions

Because the Court grants summary judgment to Defendant, Defendant's Motion to Exclude Dr. Trepeck and Plaintiff's Motion to Exclude Dr. McLean are denied as moot.[6]

[6] Plaintiffs' other expert, Dr. Trepeck, is a rebuttal expert to Defendant's expert, Dr. McLean. Dr. Trepeck's conclusions are limited to Dr. McLean's report—he does not opine on the sufficiency of the warning label or propose any safe alternative designs—so even if the Court admitted his testimony and report, Plaintiffs cannot avoid summary judgment. (*See generally* Trepeck Rep.)

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion to Exclude Dr. Abraham, grants Defendant's Motion for Summary Judgment, and denies the remaining motions as moot. The Clerk of Court is respectfully directed to terminate the pending Motion at Dkt. No. 124, enter judgment for Defendant, and close this case.

SO ORDERED.

Dated: September 25, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge